# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00292-COA

**MARC L. FAIRCHILD AND DONNA D. FAIRCHILD** <span style="float:right">**APPELLANTS**</span>

**v.**

**JOHN BILBO AND GWEN BILBO** <span style="float:right">**APPELLEES**</span>

| | |
|---|---|
| DATE OF JUDGMENT: | 02/10/2014 |
| TRIAL JUDGE: | HON. M. RONALD DOLEAC |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | PHILLIP LLOYD LONDEREE |
| ATTORNEY FOR APPELLEES: | CHARLES EDWARD GREER V |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | GRANTED APPELLEES' REQUEST FOR DECLARATORY JUDGMENT AND SPECIFIC PERFORMANCE |
| DISPOSITION: | AFFIRMED: 06/23/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., BARNES AND FAIR, JJ.**

**FAIR, J., FOR THE COURT:**

¶1. John and Gwen Bilbo entered into a lease-purchase agreement (LPA) with Marc and Donna Fairchild for their property. The LPA gave the Bilbos the option to purchase the property on or before July 1, 2017. The property was covered by two hazard insurance policies. After a tornado destroyed the property, the Bilbos sought specific performance of their option to purchase. The Fairchilds refused. The chancellor found that the Bilbos were entitled to specific performance as well as the insurance proceeds from both policies. We affirm the chancellor's decision.

## FACTS

¶2. The Fairchilds owned real property in Forrest County, Mississippi. On June 27, 2012, they entered into the LPA to lease/sell their home to the Bilbos. The Fairchilds provided the Bilbos the option to purchase the property for $80,000 on or before July 1, 2017. As consideration, the LPA required the Bilbos pay a down payment of $15,000 to the Fairchilds on or before July 31, 2014, to be applied to the purchase price. The LPA also required the Bilbos to "make monthly payments in the amount of $489.88 including principal and interest according to the amortization schedule . . . and additionally the escrow applied at the designated rate of the [Fairchilds'] loan." The LPA also required the Bilbos to "maintain a hazard insurance policy with a minimum of $80,000 on the structure and dwelling located on the property only," with the Fairchilds named as additional insured. The LPA further stated that "[b]oth parties agree and understand that any destruction of the improvements on the property by fire, flood or otherwise, shall not terminate or void this Agreement."

¶3. The Bilbos obtained a hazard insurance policy through State Farm Fire and Casualty Company ("State Farm") in the amount of $89,900 — $9,900 more than what was required under the LPA. Meanwhile, the Fairchilds had a separate hazard insurance policy on the property through Alfa Insurance ("Alfa"). The Alfa policy was obtained when the Fairchilds took out a mortgage loan on the property, prior to the LPA. The Alfa policy was paid through the escrow account and named the Fairchilds and the mortgage holder as the insureds.

¶4.     Under the LPA, the Bilbos' monthly rental payment included an escrow insurance payment for the Alfa policy ($489.99) plus the escrow applied at the designated rate of the Fairchilds' current loan, totaling $730.97 per month. The Bilbos paid the escrow payments on the Fairchilds' mortgage from August 2012 to September 2013, during which time the State Farm and Alfa policies were in effect.

¶5.     On February 10, 2013, a tornado hit Forrest County. Improvements to the Fairchilds' property were adjusted as a total loss. No one disputes that State Farm is willing to pay the full coverage under its policy ($89,900). Alfa is willing to pay the difference in the total-loss estimate above the State Farm coverage up to the limits of the Alfa policy ($126,000).[1]

¶6.     After the tornado damage, the Fairchilds issued a letter to the Bilbos, providing two options: (Option A) the Bilbos purchase the property for the amount agreed upon in the LPA (less any paid principal), with the remaining insurance money to go to the Bilbos after all expenses and debts are paid, or (Option B) the Fairchilds retain ownership of the property, with the Bilbos forfeiting their claim to the property and the dwelling-restoration money from the insurance. The Bilbos timely executed Option A. But the Fairchilds refused to sell the property because the Bilbos planned to use insurance proceeds to purchase the property.

¶7.     The Bilbos sought specific performance of the LPA and sued for breach of contract. The Fairchilds denied all allegations and counterclaimed, arguing quantum meruit and unjust

---

[1] The Fairchilds' attorney stated that the Alfa policy covered up to $119,000, $124,000, or $126,000.

enrichment; they also claimed that the Bilbos lacked an insurable interest in the property. The chancellor ruled in favor of the Bilbos, granting their request for specific performance. The chancellor also ordered that the Bilbos receive the full benefit of the insurance proceeds paid by State Farm ($89,000), from which they could pay the $80,000 purchase price to the Fairchilds. The Alfa insurance proceeds were to be deposited into the trust account of the closing attorney for the Bilbos' benefit and used to replace and rebuild improvements on the property. The chancellor denied all the Fairchilds' claims. Aggrieved, the Fairchilds appeal.

## STANDARD OF REVIEW

¶8.     A chancellor's fact-finding must not be disturbed unless the chancellor was manifestly wrong or clearly erroneous, or applied an erroneous legal standard. *Creely v. Hosemann*, 910 So. 2d 512, 516 (¶11) (Miss. 2005) (citation omitted). "This Court will not reverse a chancery court's factual findings, where there is substantial evidence in the record supporting these findings of fact." *Floyd v. Floyd*, 949 So. 2d 26, 28 (¶5) (Miss. 2007) (internal citations omitted).

¶9.     "The standard of review for questions concerning the construction of contracts are questions of law that are committed to the court rather than to the fact[-]finder." *Cherry Bark Builders v. Wagner*, 781 So. 2d 919, 921 (¶5) (Miss. Ct. App. 2001) (citation omitted). "Appellate courts review questions of law de novo." *Id*.

## DISCUSSION

### 1.  Did the Bilbos Exercise Their Option to Purchase?

4

¶10.   An option contract is not a contract to sell, but it transforms into a sales contract when the option holder exercises the option. *Prestenbach v. Collins*, 159 So. 3d 531, 533 (¶9) (Miss. 2014) (citation omitted). "When the option holder exercises the option 'the option-giver has no choice but to sell when the option is accepted according to its terms.'" *Id*. An option contract requires: (1) a description of the property, (2) consideration, and (3) a date when the option must be exercised. *Creely*, 910 So. 2d at 520 (¶31) (citation omitted). The LPA adequately describes the lot and requires as consideration $15,000 be paid to the Fairchilds on or before July 31, 2014. Thus, it falls within those parameters.

¶11.   The Fairchilds argue that coverage from both policies creates unjust enrichment for the Bilbos. Donna Fairchild testified that she was unaware that the Alfa policy still existed and never intended to have two separate hazard insurance policies in effect. As the chancellor correctly noted, this oversight is beneficial since both policies will pay. Double coverage gives no reason for the Fairchilds to refuse the Bilbos' exercise of their option to purchase. This Court will enforce a contract that is "clear, definite, explicit, harmonious in all its provisions, and is free from ambiguity." *Bert Allen Toyota Inc. v. Grasz*, 909 So. 2d 763, 770 (¶20) (Miss. Ct. App. 2005) (citation omitted). The language used in the LPA meets that criteria and should be enforced.

¶12.   The Fairchilds further argue that, since the Bilbos cannot pay the full amount of the purchase price without the insurance proceeds, they are not required to sell. While the contract required the Bilbos to pay the purchase price "on or before July 1, 2017," nothing

in the contract suggests that they were required to pay or show their ability to pay the purchase price prior to closing. In *Busching v. Griffin*, 542 So. 2d 860, 864-65 (Miss. 1989), our supreme court held that is not necessary for an option holder to tender the purchase price in order to exercise the option. The holder of an option is entitled to specific performance of the optionor's duty to convey, so long as the holder is *willing* to pay the option price. *Id.* at 864 (citing *Clinton Serv. Co. v. Thornton*, 233 Miss. 1, 10, 100 So. 2d 863, 867 (1958)).

¶13. Specific performance of a contract may be ordered only when the contract is reasonably complete and reasonably definite on material points. *Leach v. Tingle*, 586 So. 2d 799, 802 (Miss. 1991). Specific performance is proper here, as the contract meets those requirements. The Fairchilds drafted the LPA with an option to purchase. And the Bilbos timely exercised that option. Thus, we find the chancellor properly ordered the Fairchilds to sell the property.

**2. Do the Bilbos Have an Insurable Interest?**

¶14. The Fairchilds disagree with chancellor's finding that the Bilbos had an insurable interest in the property. "All that is required for one to have an insurable interest in property is that the insured will suffer an economic loss if the property is destroyed." *Necaise v. U.S.A.A. Cas. Co.*, 644 So. 2d 253, 258 (Miss. 1992) (citations omitted). This was certainly the case when the Bilbos took out the insurance policy with State Farm. Moreover, the general rule is that the lessor and lessee have an insurable interest in a leased property. *Fry v. Jordan Auto Co.*, 80 So. 2d 53, 57 (Miss. 1955). The chancellor correctly found that both

6

parties had an insurable interest in the property.

### 3. Were the Bilbos in Default Under the LPA?

¶15.    The Fairchilds claim that the Bilbos were in default when they stopped making rental payments in September 2013. The chancellor found that the Bilbos acted reasonably when halting their monthly payments because the Fairchilds refused to sell the property after the Bilbos exercised their option to purchase. He reasoned that "[n]either law nor equity allows the Fairchilds to offer to honor the purchase option with remaining insurance proceeds to go to the Bilbos, . . . then rescind that offer and position, and then come into court seeking termination of the LPA and default on the part of the Bilbos . . . ." We agree.

¶16.    There exists a "principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." *Morris v. Macione*, 546 So. 2d 969, 971 (Miss. 1989) (citation omitted). Here, the Fairchilds contracted under the LPA to sell the property, if or when the Bilbos exercised their option to purchase. The Fairchilds' letter sent after the tornado specified the terms of the Bilbos' option to purchase (Option A) as originally stated in the LPA. When the Bilbos exercised that option, the Fairchilds failed to perform under the LPA. "Failure by the promisor to perform at the time indicated for performance in the contract establishes an immediate breach." *Franconia Ass'n v. United States*, 536 U.S. 129, 142-43 (2002). Because it was the Fairchilds that breached the contract, the Bilbos are not in default for discontinuing their monthly payments.

### 4. Should the Fairchilds and Bilbos Share Insurance Proceeds?

¶17. The Fairchilds argue that the chancellor erred in finding that both parties should share the insurance proceeds. The State Farm policy lists the Fairchilds and Bilbos as named insureds. The Alfa policy, however, does not list the Bilbos as named insureds. The chancellor used the test applied in *Vaughn v. Monticello Insurance Co.*, 838 So. 2d 983 (Miss. Ct. App. 2001), to determine whether proceeds should be shared by parties who are not named insureds. The test considers the following factors: (1) whether the insurance was obtained for the sole benefit of the person who procured it; (2) whether by express or implied agreement the person who took out the insurance did so for the benefit of the owners of the other interests in the property; and (3) whether the owners of the other interests contributed to the cost of the insurance." *Id*. at 989 (¶27) (citations omitted).

> (1) *Whether the insurance was obtained for the sole benefit of the person who procured it.*

¶18. The Bilbos procured the State Farm policy pursuant to the LPA, with John Bilbo as the named insured, the Fairchilds as additional insureds, and the mortgage holder as the mortgagee. The Alfa policy was paid for out of the escrow account managed by the Fairchilds' lender; it listed the Fairchilds as named insureds and their mortgage holder as mortgagee. The chancellor found this factor favored both parties having an interest in the proceeds of the State Farm policy. He did not make a finding in regard to the Alfa policy.

> (2) *Whether by express or implied agreement the person who took out the insurance did so for the benefit of the owners of the other interests in the property.*

8

¶19. The chancellor found this factor favored both parties in regard to the State Farm policy, because the policy was procured based on both their interests in the LPA. The chancellor also found both parties had an interest in the Alfa policy. He based his conclusion on the fact that the Bilbos were required as part of the LPA to pay for the escrow items of the Fairchilds' mortgage, which included ongoing premiums for hazard insurance. And although Donna Fairchild testified that she wanted to repair the destroyed property, the LPA grants the Bilbos the option to purchase at any time, including when repairs have not yet been made. The chancellor found that, as long as the Fairchilds receive their payment as required by the LPA ($80,000), equity and fairness necessitate the remaining State Farm and Alfa proceeds be made available to the Bilbos for repairs (similar to Option A in the Fairchilds' letter).

(3) *Whether the owners of the other interests contributed to the cost of the insurance*.

¶20. The chancellor found that the LPA required the Bilbos pay for insurance on the property. He also found that the Bilbos met the requirement by paying funds directly to State Farm (State Farm policy) and paying into the escrow account for the payment of ongoing premiums (Alfa policy). The chancellor determined that this factor weighed heavily in favor of the Bilbos, primarily because "[t]he Fairchilds shifted all costs of the home, including continuing costs of insurance, to the Bilbos."

¶21. The chancellor ultimately concluded that the sums paid by the Bilbos for insurance on the property were paid with the intention that the insurance should protect both sides and would be payable to each party as their interests appeared in the LPA. After careful review,

9

we find the chancellor was not manifestly wrong. There is substantial evidence in the record (as discussed in the factors above) to support the chancellor's finding.

**5. Should the Fairchilds Be Able to Use the Insurance Proceeds to Rebuild the Property?**

¶22.    The Fairchilds claim the chancellor erred in finding that the Fairchilds' request for full use of the insurance proceeds to repair the property was inconsistent with the Bilbos' right to exercise their option to purchase under the LPA. The chancellor reasoned that, "[i]n such instance, the Bilbos could not rebuild the improvements and would lose the benefit of the bargain. Moreover, the parties agreed on an $80,000 purchase price, and the Bilbos are being held to their obligation to pay that amount per the LPA."

¶23.    We find the chancellor's decision was supported by substantial evidence. The LPA allows the Bilbos to exercise their right to purchase *at any time*, even when repairs have not been made. They exercised that option after receiving the Fairchilds' letter. The chancellor correctly determined that granting the Bilbos access to the insurance proceeds would allow the Fairchilds to "receive equity from the transaction of the difference in the payoff of their loan amount . . . less the payment credits due the Bilbos under the LPA, and the $80,000 purchase price." Essentially, each party will get what he or she bargained for under the LPA.

¶24.    We find the chancellor committed no manifest error. Thus, we affirm.

¶25.    **THE JUDGMENT OF THE FORREST COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS,**

**CARLTON AND MAXWELL, JJ., CONCUR.  JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE OPINION.**