# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00084-COA

**TERRY LEE ING**                                                                            **APPELLANT**

**v.**

**SONG ADAMS**                                                                              **APPELLEE**

DATE OF JUDGMENT:           12/13/2016
TRIAL JUDGE:                HON. JOHN ANDREW GREGORY
COURT FROM WHICH APPEALED:  MARSHALL COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     JOSEPH WHITTEN COOPER
ATTORNEY FOR APPELLEE:      KENT E. SMITH
NATURE OF THE CASE:         CIVIL - CONTRACT
DISPOSITION:                REVERSED AND REMANDED - 05/15/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

EN BANC.

WILSON, J., FOR THE COURT:

¶1.     This case involves an option to purchase in a lease agreement between Terry Lee Ing and Song Adams. Ing gave Adams timely written notice of his intent to exercise the option, but Adams refused to convey the property. Adams subsequently sued Ing for eviction, and Ing counterclaimed for breach of contract. After a bench trial, the circuit court ruled that Ing had forfeited his right to purchase the property because he did not "adequately exercise" the option. The trial court also ruled that Ing was liable for rent for the period after the expiration of the initial lease term. Ing challenges both of these rulings on appeal.

¶2.     We hold that Ing took sufficient steps to exercise the purchase option. Once Adams expressly refused to sell the property, Ing was not required to tender funds or obtain an

appraisal. We also hold that Ing is not liable for rent for the period following Adams's wrongful refusal to convey the property. During that period, Ing was the equitable owner of the property, not a "holdover tenant." Therefore, no "holdover rent" is owed. We reverse and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶3.     Adams owns a three-level building on West Van Dorn Street on the courthouse square in Holly Springs. Adams owns and operates a liquor store on the main level of the building, and she rents out the upstairs as an apartment. The basement houses Victor's Pizza, a restaurant formerly owned by Adams's husband, Mike. Mike sold Victor's Pizza to Ing.

¶4.     On January 26, 2010, Adams and Ing entered into a five-year lease for the basement. The lease agreement required Ing to pay Adams rent of $2,500 per month plus thirty-three percent of the property taxes on the building. The agreement also provided that at the end of the initial five-year lease term, Ing would have "the option to extend the lease for an additional five years or to purchase the building at it's [sic] then appraised value."

¶5.     On January 22, 2015, four days before the end of the initial lease term, Ing provided Adams with a signed, handwritten notice of his intent to exercise the purchase option. The notice stated that the purchase price would "be at appraised value as agreed." On January 26, 2015, Adams responded to Ing through a letter from her attorney. Adams acknowledged Ing's desire to exercise the purchase option but expressly stated that she did "not desire to sell the building to [him]." Adams stated that she was willing to continue to lease the basement to Ing but only "on a month to month basis." Adams also alleged that Ing had

2

"committed several [unspecified] violations of the terms of the lease."

¶6.     Ing remained in the building and continued to operate Victor's Pizza, but he stopped paying rent.  On March 19, 2015, Adams filed a complaint in circuit court for eviction, damages, and other relief.  Adams's complaint acknowledged that Ing had given notice of his intent to exercise the purchase option.  However, Adams alleged that Ing had "failed to tender any money toward the purchase of the property" and had "made no other overt actions toward purchasing the property."  The complaint failed to mention Adams's own refusal, through counsel, to sell the building.  Adams also alleged that Ing had committed several violations of the lease, such as operating a gold buying business on the premises, residing on the premises, failing to maintain insurance, and failing to pay his share of the property taxes.  The complaint sought damages, a declaration that the lease had terminated and that the purchase option had expired, and an order requiring Ing to vacate the premises.

¶7.     Ing answered and asserted a counterclaim.  Ing denied that he had breached the lease agreement, he denied that Adams was entitled to damages or any other relief, and he alleged that Adams had breached the agreement by refusing to sell the building.  Ing alleged that he had not taken steps to purchase the property only because "Adams ha[d] explicitly stated that she [was] not going to sell him the property."[1]

----

[1] Ing's counterclaim does not specifically request specific performance, although it does request "any and all additional, general, and/or special relief available to [Ing] at law or in equity which the Court may . . . deem appropriate, just, and proper."  At trial, Ing testified that he wanted to buy the building in January 2015 and still wanted to buy it.  At the conclusion of the evidence, both Adams and Ing moved, without objection, to amend the pleadings to conform to the proof at trial.  In the trial court's final judgment, the court treated Ing's counterclaim as including a claim for specific performance.

3

¶8. The case proceeded to a bench trial on May 26, 2016. Ing testified that he attempted to exercise the purchase option prior to the expiration of the initial lease term, but Adams refused to sell him the building—both orally and through the letter from her lawyer. Ing also proved that he had insurance and had paid his share of the property taxes. He testified that he had not incurred the expense of an appraisal only because Adams refused to sell him the building. He also testified that he had inquired with banks about a loan to buy the building; however, the banks told him that this litigation needed to be resolved first.

¶9. Adams's husband, Mike, testified that he had obtained an appraisal for the building from a licensed appraiser. The February 2015 appraisal, which was introduced into evidence, estimated the market value of the building to be $350,000. There is no evidence that the appraisal was ever disclosed or provided to Ing prior to trial, and on appeal, Ing denies that it was. On cross-examination, Mike testified that he thought that his wife still "want[ed] to sell" the building to Ing. When asked why, then, her lawyer sent Ing a letter refusing to sell, Mike said, "I may be out of the loop on that."

¶10. Adams's testimony was confusing to say the least. She testified that she was willing to sell the building to Ing, but she thought that Ing would pay her $700,000. Adams did not explain why she thought that Ing would pay her $700,000 other than that she thought her building was "a million-dollar building." When asked why her attorney sent Ing a letter refusing to sell the building, Adams finally said, "I don't know what's going on."

¶11. After both sides rested, Adams's lawyer conceded that his "client [had] just testified that she was still willing to sell the building"; therefore, most of Adams's allegations that Ing

4

had violated the lease "would not matter because [Adams] ha[d] indicated her willingness to sell the building for fair market value consistent with the provisions of the lease."

¶12. The parties' attorneys then debated whether Ing was liable for rent for the period after the expiration of the initial lease term. Ing argued that he was not liable for rent because Adams had breached their agreement by refusing to convey the property. Adams argued that Ing was liable for rent because he had done nothing to purchase the property. The court took the case under advisement.

¶13. The court subsequently entered a final judgment with findings of fact. The court first found that Ing was not in material breach of the lease during the initial lease term; therefore, Ing "had the right to exercise the option to purchase up to January 26, 2015." However, the court also found that Ing "did NOT adequately exercise his option to purchase the property." The court noted that Ing did not tender money to purchase the property or obtain an appraisal. The court next ruled that Ing owed Adams rent of $2,500 per month for each month following the expiration of the initial lease term. Finally, the court ordered Ing to vacate the premises within thirty days. The judgment was stayed pending appeal.

**ANALYSIS**

¶14. Two issues are before this Court on appeal: whether Ing adequately exercised his purchase option and whether he is liable for rent for the period after the expiration of the initial lease term. "The standard of review for a judgment entered following a bench trial is well settled." *Maldonado v. Kelly*, 768 So. 2d 906, 908 (¶4) (Miss. 2000). Any findings of fact made by the trial judge will not be disturbed when "they are supported by substantial,

5

credible, and reasonable evidence." *Id.* However, we review issues of law de novo. *Id.*

## I. Ing Adequately Exercised the Option to Purchase

¶15. "A valid and enforceable option contract requires: (1) an adequate description of the property, (2) consideration, and (3) a date when the option must be exercised." *Prestenbach v. Collins*, 159 So. 3d 531, 533 (¶9) (Miss. 2014). These conditions are satisfied in this case. There is no dispute as to the property involved[2] or that there was consideration. Finally, the lease granted Ing the right to exercise the option "[a]t the end" of the initial lease term, and Ing gave timely notice four days prior to the expiration of the lease term.

¶16. On appeal, Adams briefly argues that option is unenforceable because it fails to specify a sales price. However, this issue was not raised or addressed in the trial court.

¶17. In response, Ing argues that the option is enforceable under this Court's decision in *Crow v. Crow's Sports Center Inc.*, 119 So. 3d 352 (Miss. Ct. App. 2012). In *Crow*, this Court addressed a lease that granted the lessee an option to purchase the "property for a fair market value as determined by appraisal by a licensed real estate appraiser or such other term as the parties [might] negotiate between themselves." *Id.* at 354 (¶2) (alteration omitted). The lessor argued the option was unenforceable because it "fail[ed] to state a specific purchase price." *Id.* at 356 (¶10). However, this Court disagreed. We held that although "there was no stated purchase price, . . . there was a clear method of determining one"—i.e., an appraisal by a licensed appraiser. *Id.* at (¶12). Ing notes that the option at issue in this case provides that the purchase price shall be the building's "then appraised value." Ing

---

[2] The parties agree that Ing was granted an "option . . . to purchase the building"—i.e., the entire building, not just the basement, which was the subject of the lease.

argues that "appraised value" necessarily implies an appraisal by a licensed real estate appraiser, which we deemed sufficiently definite in *Crow*.

¶18.    Given that Adams did not raise this issue in the trial court, we agree with Ing that the price term is sufficiently definite to be enforced.  We also note that at oral argument, Ing essentially conceded that he was "stuck" with the $350,000 appraisal presented by Adams at trial since he had not offered a competing appraisal.

¶19.    Adams's primary argument on appeal is that the trial court correctly found that Ing failed to take sufficient steps to exercise the option.  Adams argues that Ing "made no attempt to have the building appraised," "has not tendered any payment towards the purchase price," and "has given no assurances of his ability to pay."  However, once Adams expressly refused to convey the property, Ing was not required to take any of these steps.

¶20.    "[W]ritten notice to the seller of intent of the option holder to exercise an option has the effect of an acceptance, converting the option into an enforceable bilateral contract.  *It is not necessary for an option holder to tender the purchase price in order to exercise the option*."  *Creely v. Hosemann*, 910 So. 2d 512, 519 (¶29) (Miss. 2005) (emphasis added) (citing *Busching v. Griffin*, 542 So. 2d 860, 864-65 (Miss.1989)).  Indeed, "[a]bsent language in the contract to the contrary, an option holder has no obligation or duty to show an *ability* to pay the entire sales price before the closing."  *Prestenbach*, 159 So. 3d at 534 (¶12) (emphasis added). "The holder of an option is entitled to specific performance of the optioner's duty to convey, so long as the holder is willing to pay the option price."  *Creely*, 910 So. 2d at 519 (¶29).

7

¶21. Thus, contrary to Adams's arguments, it was not necessary for Ing to tender the purchase price or prove or provide assurances of his ability to pay. The law is clear that Ing's written notice to Adams effectively converted the option into an enforceable sales contract. *Id.*; *Prestenbach*, 159 So. 3d at 533-34 (¶¶10-12). We also hold that Ing did not forfeit his right to exercise the option by not obtaining an appraisal. When Ing attempted to exercise his option, he received a prompt response from Adams's lawyer that Adams did "not desire to sell the building to [him]," and Adams then sued him for eviction. In the face of Adams's clearly stated refusal to honor the option and convey the property, Ing was not required to incur the expense of an appraisal. *See, e.g.*, *Cooley v. Stevens*, 240 Miss. 581, 592, 128 So. 2d 124, 128 (1961) ("The law does not require one to do a vain and useless thing.").

¶22. We hold that Ing's written notice to Adams was sufficient to exercise the purchase option. There was no valid basis for Adams to refuse to convey the property, and Ing was entitled to specific performance of the option to purchase.

## II. Ing Does Not Owe Adams "Holdover Rent"

¶23. Adams also argues that the trial court properly ordered Ing to pay rent of $2,500 per month for the period after the initial lease term, which would now amount to approximately $100,000. We disagree. Ing was prevented from purchasing the building because *Adams* breached the parties' contract. Under these circumstances, Ing was not a "holdover tenant," and he was not required to pay holdover rent.

¶24. Two federal district courts have addressed this issue recently. As those courts have held, when a landlord refuses to convey property to its tenant pursuant to a validly exercised

8

purchase option, the tenant is *not* transformed into a "holdover tenant." *Straus v. United States Postal Serv.*, No. 16-4117, 2018 WL 741791, at *2 (E.D. Pa. Feb. 6, 2018); *United States Postal Serv. v. Jamke*, No. 1:15-cv-01806-LJO-EPG, 2017 WL 1650625, at *3 (E.D. Cal. May 2, 2017). Rather, once the tenant exercises the option, the tenant becomes the "equitable owner" of the property. *Straus*, 2018 WL 741791, at *2; *Jamke*, 2017 WL 1650625, at *3. Under these circumstances, the tenant cannot "be both the rightful owner . . . and a holdover tenant." *Jamke*, 2017 WL 1650625, at *3. "Thus, no holdover rent [is] due by law, as [the tenant is] the equitable owner of the property and [is] not a holdover tenant." *Straus*, 2018 WL 741791, at *2.

¶25. These recent federal district court decisions are consistent with a long line of rulings of other courts.[3] They are also consistent with this Court's decision in *Fairchild v. Bobo*, 166 So. 3d 601, 606-07 (¶¶15-16) (Miss. Ct. App. 2015). In *Fairchild*, this Court held that a landlord wrongfully refused to convey property pursuant to the purchase option of a lease-purchase agreement. *See id.* at 606 (¶13). This Court then held that the landlord's refusal to convey the property was a breach of the contract and excused the tenants from their duty

---

[3] *See, e.g.*, *United States v. Turley*, No. 15-CV-78-JHP, 2016 WL 8671924, at *11 (E.D. Okla. Nov. 18, 2016), *aff'd*, 878 F.3d 953 (10th Cir. 2017); *United States v. Americo Fisco Revocable Tr.*, No. 1:14-cv-2579, 2016 WL 4565470, at *6 (N.D. Ohio Aug. 31, 2016); *United States v. Bethlehem Steel Co.*, 215 F. Supp. 62, 71-72 (D. Md. 1962) ("The cases hold that where there has been an effective exercise of an option by the purchaser's giving proper notice, followed by a delay on the part of the seller in consummating the transaction, the seller may not recover rent for the intervening period . . . ."), *aff'd*, 323 F.2d 655 (4th Cir. 1963) (per curiam); *Sacks v. Hayes*, 304 P.2d 281, 282 (Cal. Super. Ct. App. Dep't 1956); *Cities Serv. Oil Co. v. Viering*, 89 N.E.2d 392, 402 (Ill. 1949); *Rosenthal v. Shapiro*, 52 N.W.2d 859, 861-62 (Mich. 1952); *Shupe v. Ham*, 639 P.2d 540, 543-44 (Nev. 1982); *Chapman Drug Co. v. Chapman*, 341 S.W.2d 392, 397 (Tenn. 1960); *Pittman v. Sanditen*, 626 S.W.2d 496, 497-98 (Tex. 1981).

to continue to pay rent. *Id.* at 607 (¶16) ("Because it was the [landlord] that breached the contract, the [tenants] are not in default for discontinuing their monthly payments.").[4]

¶26. The result is the same in this case. Following Adams's refusal to convey the property pursuant to the purchase option, Ing was the "rightful and equitable owner" of the property, not a mere "holdover tenant." *Jamke*, 2017 WL 1650625, at *3. Ing "could not be both the rightful owner . . . and a holdover tenant. This point bears emphasis: at *no point* was [Ing] a holdover tenant." *Id.* "Thus, no holdover rent was due by law, as [Ing] was the equitable owner of the property and was not a holdover tenant." *Straus*, 2018 WL 741791, at *2.[5]

**CONCLUSION**

¶27. Ing took sufficient steps to exercise the option to purchase and is entitled to specific performance. We therefore reverse and remand this case to the circuit court with instructions

---

[4] The partial dissent's reliance on *Murphree v. Aberdeen-Monroe County Hospital*, 671 So. 2d 1300 (Miss. 1996), is misplaced. *Murphree* did not have anything to do with a purchase option. It involved a landlord who filed two lawsuits against its tenant—the first to recover unpaid rent under the lease agreement and a second to recover "holdover" rent for a period after the expiration of the lease. The Supreme Court simply held that the judgment in favor of the landlord in the first suit did not bar a second judgment in favor of the landlord in the second suit—i.e., res judicata did not apply. *See id.* at 1302-04. *Murphree* did not hold that a landlord is entitled to collect "holdover" rent following the landlord's own wrongful refusal to convey title pursuant to a valid purchase option.

[5] We note that it would be especially inequitable to award Adams "holdover rent" on the facts of this case. We would be rewarding Adams's wrongful refusal to convey the property with an additional $100,000 in rent that she would not have been entitled to had she honored the parties' agreement. In addition, Adams has been able to operate her liquor store rent-free during the three-plus years since she refused to convey the property. If Adams had honored the parties' agreement, she presumably would have had to pay rent to Ing for that space. Finally, Adams has continued to collect rent on the upstairs apartment for three years. If Adams had fulfilled her obligation to convey the property, Ing presumably would have collected that rent as well.

10

to set a reasonable closing date for the sale—taking into account Ing's need, if any, to secure financing—based on the sole appraisal offered at trial. *See Prestenbach*, 159 So. 3d at 533-34 (¶¶10, 13). As the equitable owner of the property, Ing was never a holdover tenant and is under no obligation to pay holdover rent. Therefore, we reverse that part of the circuit court's judgment as well.[6] Accordingly, this case is reversed and remanded for further proceedings consistent with this opinion.

¶28. **REVERSED AND REMANDED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION**.

**CARLTON, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶29. I agree with the majority's finding that Ing adequately exercised his option to purchase the property pursuant to the terms of the lease agreement. However, I find no error in the circuit court's award to Adams of past-due rent payments owed by Ing for the period when the written lease agreement was expired. Our applicable standard of review requires that we affirm the findings of fact by the trial court if supported by substantial evidence. *Falkner v. Stubbs*, 121 So. 3d 899, 902 (¶8) (Miss. 2013). I would therefore affirm the circuit court's judgment in part, and reverse and remand in part.

¶30. On January 26, 2010, Ing and Adams entered into a five-year lease agreement. The terms of the agreement provided that Ing would rent the basement and parking lot of the three-story building located at 110 Van Dorn Avenue, Holly Springs, Mississippi, from

---

[6] In the event that Ing fails to meet his obligations to tender the purchase price and close on the contract, the issue of holdover rent would have to be revisited.

Adams at a rate of $2,500 per month for five years. The lease agreement also included the following language: "At the end of this current five[-]year lease, provided that [Ing] is current upon all conditions of this lease, he has the option to extend the lease for an additional five years or to purchase the building[7] [for] it's [sic] then appraised value." The lease contained no provision allowing Ing to remain in the property rent free after expiration of the lease.

¶31.    On January 22, 2015, four days prior to the expiration of the lease agreement, Ing hand-delivered a letter to Adams stating that he intended to exercise his right to purchase the property. In his letter, Ing stated that "[t]he purchase price shall be at appraised value as agreed." According to Ing, when Adams realized that he intended to purchase the property, Adams told him "no," and refused to sell the property.

¶32.    On January 26, 2015, the day the lease agreement expired, Ing received a letter from Adam's attorney alleging that Ing had committed several violations of the terms of the lease agreement. The letter further stated that Adams "[did] not desire to sell the building" to Ing but offered to lease the premises to Ing on a month-to-month basis.

¶33.    Ing testified that after receiving Adams's letter stating that he would not be able to purchase the property, he withheld rent payments but maintained his presence in the property. At the time of trial, Ing testified that as a result of Adams's refusal to sell, he had not made rent payments to her in sixteen months.

¶34.    Adams filed a complaint on March 19, 2015, claiming Ing was in breach of the lease

---

[7] At trial, Ing clarified in his testimony that the option to purchase set forth in the lease agreement referred to the entire building and not just the basement.

agreement and a holdover tenant, according to the terms of the lease agreement. Adams specifically alleged that Ing violated the terms of the lease agreement by failing to tender the agreed portion of the ad valorem tax liability, failing to comply with the city's ordinance regarding commercial add-ons, and failing to maintain liability insurance. Adams requested that the circuit court award her damages as a result of Ing's breach of the lease agreement and evict Ing from the property.[8] As I will discuss later in this separate opinion, the record shows that the lease agreement expired on January 26, 2015, and Ing had not paid rent since that date.

¶35. Ing filed his answer on April 16, 2015. He also filed a counterclaim for damages alleging that Adams was in breach of contract by not selling him the property.

¶36. At a bench trial on May 26, 2016, the circuit court heard testimony from Ing and Adams, as well from as Adams's husband, Michael Adams. Ing testified that as a result of Adams refusing to allow him to exercise his option to purchase the property, he had withheld rent payments since January 2015. The following exchange occurred:

> Q. And you haven't paid her any rent since January 2015, have you?
>
> A. No. Because she breached the contract, sir.
>
> Q. Okay. So your testimony and position is that she breached the contract and so you've been there February through December of 2015, 11 months no rent?
>
> A. Yeah.
>
> Q. And you've been there January through May 2016 and you've paid no

---

[8] In her complaint, Adams sought only "past-due rent," and did not request double rent.

13

rent?

Q. I haven't paid anything since she said, "no."

. . . .

Q. So we have 16 months of unpaid rent over there?

A. Yes.

¶37. Regarding whether Ing paid his portion of the ad valorem taxes as required by the lease agreement, Ing testified as follows:

Q. So the 2015 taxes you have not paid; is that right?

A. Well, they breached the contract, yeah.

Q. I understand that's your position. I'm asking you have you paid the taxes?

A. No.

However, Ing testified and presented evidence that he did pay taxes for 2014.

¶38. Michael testified that after learning that Ing intended to purchase the property, he contacted Mike Shaw with Shaw Appraisals, a real estate appraiser, to perform an appraisal. Michael testified that Shaw provided Michael with a real estate appraisal for the property. The appraisal was admitted into evidence as Exhibit 3, and the appraisal listed the value of the property as of February 13, 2015 (approximately three weeks after the lease agreement expired) to be $350,000.[9] The record reflects that Ing failed to provide an appraisal to dispute the appraisal Michael obtained.

¶39. Adams testified that she did want to sell the property to Ing. Adams stated that after

_____

[9] The appraisal reflects that Shaw is a state-certified real-estate appraiser.

14

Ing sent her the January 2015 letter stating that he intended to purchase the property, she told him that he could purchase the building for $700,000, and Ing agreed to the price. When Ing failed to make any payment towards the amount, Adams asked Ing at what date he intended to purchase the property. Adams testified that Ing told her that he would talk to his attorney. Adams testified that Ing never made any payments towards the purchase of the building, and that Ing also stopped making rent payments. Adams testified that she would still allow Ing to pay the past-due rent he owed her and also purchase the property for the fair market value.

¶40. At trial, Adams refuted Ing's claim that she refused to allow him to exercise his option to purchase the property. Adams maintained she wanted to sell Ing the property, and that she and her husband even celebrated after Ing made the offer. Adams testified as follows:

> Q. One final question, Mrs. Adams, did you ever tell Terry Ing that you would sell him the building?
>
> A. Yeah, I tell sell building. [sic]
>
> Q. How come four days later he received a letter saying you will not sell him the building?
>
> A. I don't know what's going on. I don't know what is going on. I tell him why my husband say sell. Tell I'm so happy. [sic]

¶41. On December 13, 2016, the circuit court entered an order finding that Ing did not materially breach the terms of his lease agreement with Adams, and thus Ing had the right to exercise the right to purchase the property up to end of the lease agreement. However, the circuit court found that Ing never offered Adams any money for purchase of property and "no appraisal was performed to complete the purchase option." As a result, the circuit court held that Ing "did NOT adequately exercise his option to purchase" the property.

15

¶42.	The circuit court also found that after the lease period expired, Ing "was a hold-over tenant who had a month-to-month lease[,]" and that "[Adams] was obligated to give [Ing] a thirty (30) day notice of the termination of said 'amended' lease." The circuit court determined that "[Adams] implied a termination of said lease through the letter claiming violation of the terms of the lease and thereafter by verbally communicating the same to [Ing]." The circuit court found Ing in arrears and ordered Ing to vacate the property and pay Adams rent payments "in the monthly amount of $2500.00 per month as of the last rents paid minus any credit for partial payment, if any."[10]

¶43.	A review of the record reflects that the amount of monthly rent in arrears assessed by the trial court was consistent with the terms of the lease agreement that allowed Ing to extend the lease beyond its expiration and continue to make rent payments in the amount of $2,500 a month. The trial court assessed Ing $2,500 a month in rent payments for the occupancy of the premises after the lease expiration.

¶44.	"[W]e give a circuit-court judge presiding in a bench trial the same deference with regard to his findings as a chancellor." *Falkner*, 121 So. 3d at 902 (¶8) (internal quotation mark omitted). "[W]e review the circuit court's interpretation and application of the law de novo, and its findings of fact will not be reversed if supported by substantial evidence." *Id*.

¶45.	As stated, I agree with the majority's decision to reverse the circuit court's determination as to the issue of the option contract and remand this case to the circuit court

---

[10] The circuit court awarded Adams past-due rent payments in the monthly amount as set forth in the lease agreement. The circuit court did not award Adams double rent payments.

16

with instructions to order specific performance of the lease agreement utilizing the sole appraisal offered at trial and to set a closing date for the sale of the property. However, I disagree with the majority's determination that the circuit court erred in finding that Ing owes Adams unpaid rent from the time of the expiration of the lease agreement. The evidence in the record clearly supports the findings and determination of the circuit court in awarding Adams unpaid rent for the time period at issue, after the expiration of the lease agreement.

¶46. In reviewing the lease agreement in the case and the jurisprudence, I acknowledge that the law does not require that the purchase in an option contract occur prior to expiration of the lease. The law requires only that the option be exercised in accordance with the contract terms. The record reflects that in the written lease agreement, Ing possessed the right to extend the lease for an additional five years beyond its expiration and continue to rent the premises for $2,500 a month. However, Ing remained beyond the expiration of the written lease agreement without paying rent after the lease expired. The record shows that the trial court assessed Ing $2,500 in monthly payments for the sixteen months he occupied the premises after the written lease expired. This amount reflects the same amount of monthly rent as set forth in the lease agreement. In sum, the record shows that Ing did not pay rent after the lease expired in January 2015, and during this time of unpaid rent, no written lease agreement existed.

¶47. The circuit court made the following findings of fact in his judgment:

> [Adams] asserted that [Ing] was in violation of the terms of the lease by not tendering [his] agreed portion of the ad valorem tax liability, by failing to comply with city ordinance on commercial add-ons, and by failing to maintain insurance; and thus, the purchase option was null and void. [Adams,] in

writing, gave notice to [Ing] of his breach of the lease. The alleged lease breaches were refuted by [Ing] with proof.

. . . .

[Ing] was a hold-over tenant who had a month-to-month lease after said written lease period expired. [Adams] was obligated to give [Ing] a thirty (30) day notice of the termination of said "amended" lease.

[Adams] implied a termination of said lease through the letter claiming violation of the terms of the lease and thereafter by verbally communicating the same to [Ing].

The circuit court thus determined that Ing "is in arrears and said rents are due to [Adams] in the monthly amount of $2500.00 per month as of the last rents paid minus any credit for partial payment, if any." The circuit court ordered Ing to vacate the premises.[11]

¶48.　Regarding Ing's claim that he was entitled to withhold rent payments because Adams materially breached the lease agreement, I recognize that the supreme court has held that where a tenant holds over beyond the expiration of his lease, the "action against a hold over tenant is separate and distinct from an action based on the lease agreement." *Murphree v. Aberdeen-Monroe Cty. Hosp. by Bd. of Trustees*, 671 So. 2d 1300, 1303-04 (Miss. 1996). In *Murphree*, the supreme court explained as follows:

> [t]he common law is that holding over beyond the expiration of a lawful tenancy creates a distinct cause of action for each term of the implied tenancy. Splitting an action into separate claims for separate terms may or may not still be appropriate. It remains true, however, that an action based on a prolonged holdover rests on different facts and law than those at issue in a possessory action at the conclusion of a lease term.

*Id.* at 1303 (quoting *650 Park Avenue Corp. v. McRae*, 665 F. Supp. 228, 233 (S.D.N.Y.

---

[11] *See* Miss. Code Ann. § 89-7-7 (Rev. 2011) (remedy for arrears).

18

1987) (citations omitted)).

¶49.    The record reflects that the written lease agreement at issue expired on January 26, 2015, and the record contains no evidence to show that the terms of the lease agreement were extended by either party.[12]  I find that since the written lease agreement expired and the terms were not extended, a month-to-month tenancy was then implied after January 25, 2015.[13]  Accordingly, I would affirm the circuit court's determination that Ing owed rent to Adams for occupying the premises as a month-to-month tenant after expiration of the lease, since such finding is supported by substantial evidence.  *Falkner*, 121 So. 3d at 902 (¶8); *110 S. St. LLC v. Atrium Gentlemans Club*, 217 So. 3d 794, 802 (¶35) (Miss. Ct. App. 2017).

---

[12] *See* K.F. Boackle, *Mississippi Landlord and Tenant Law with Forms* § 7:3 (2005) ("The landlord can sue for rent in arrears"; "The action against the holdover tenant is a separate action from one based on the lease agreement."); *see also* Johnny C. Parker, *Mississippi Law of Damages* § 27:14 (3d ed. 2014).

[13] *See Murphree*, 671 So. 2d at 1303-04.